## Case No. 6,947.

### HUSSEY v. FIELDS et al.

[Spr. 394; [1] 20 Law Rep. 673.]

District Court, D. Massachusetts. March 19, 1858.

SEAMEN'S WAGES—WHALING VOYAGE—PROCEEDS.

Where a whaling voyage is from necessity broken up in a foreign port, the master, on request of the seamen, is authorized to pay them their respective shares of the proceeds, by delivering to them, at such foreign port, portions of the oil taken, although, by the shipping articles, the distribution of proceeds was to be made after the return of the vessel to the home port.

[Cited in The Antelope, Case No. 484.]

[Cited in Story v. Russell, 157 Mass. 154, 31 N. E. 754.]

This was a libel brought by an officer of the whale ship Rambler against the owners, to recover his share of the proceeds which had come to their hands. The ship sailed from Nantucket in October, 1851, and prosecuted the enterprise until November, 1854, during which time she had taken eight hundred barrels of sperm oil. In that month she went into the port of Honolulu, whence she sent home to the owners the eight hundred barrels. This libel is to recover the libellant's share of the proceeds of the oil, so sent home and received by the owners. The respondents do not deny this liability, but insist that they have a right to deduct from his claim the value of 267 gallons of oil delivered to him at Apia, as hereinafter stated. After leaving Honolulu, the libellant acted as third mate, with a lay of 1/56, until the death of the master, in May,

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

1855; during this time, 10,135 gallons of sperm oil were taken. The first mate having previously left the ship, the person who had shipped at Nantucket as second mate became master, and the libellant was made second mate, and one Thompson, who had shipped at Honolulu as second mate, became first mate. At the promotion of libellant to the office of second mate, nothing was said about the lay, and no entry was made concerning the same. He was told "to take Mr. Thompson's place." After this promotion, and prior to the arrival of the Rambler at Apia, she took about seventy barrels of oil. She went into Maui in October, and to Apia in November, bringing into Apia about 12,340 gallons. There a survey was had and the ship condemned as unseaworthy. The officers and crew were there discharged, the master acting in concert with the United States consul, and all, except the libellant, were settled with, by delivering to each his share of the oil then at Apia, in the proportion which, by the shipping articles, each was to have of the net proceeds of the actual products of the voyage, upon the arrival of the ship at Nantucket. The libellant, was to have 1/56 of the oil taken before he was second mate, and 1/25 of that taken afterwards. This 1/25 was fixed upon by the master and consul, and the master gave an order upon the owners, stating the amount of the libellant's debt to the ship, and the lay to which he was entitled out of the oil sent home prior to the ship's arrival at Apia, and requesting them to pay the same. The master also gave him a bill of sale or statement, certifying the quantity of oil brought into Apia, and libellant's share thereof to be 267 gallons. The next day the libellant took the share so set off to him, which was gauged in the presence of the consul and the master, and subsequently sold it. The residue of the oil, after settlement with the officers and crew, was left with the consul, A. Van Camp, to forward to the owners at the earliest opportunity. It had been shipped on board of a vessel which had not left port, before one Jenkins, claiming to have superseded Van Camp as consul, and to have certain claims against him, seized the oil as his property, established a "consular court," and made an ex parte decree, and the same was sold to satisfy the decree. The respondents actually received none of the oil landed at Apia, though they are now pressing their claims against the United States government, for indemnity for the acts of the consul Jenkins.

T. D. Eliot and T. M. Stetson, for libellant.

S. Bartlett and D. Thaxter, for respondents.

SPRAGUE, District Judge. The question is, whether this was a valid payment of

the lay or share of the libellant, or a wrongful conversion of the 267 gallons of oil which the libellant received at Apia. After the libellant became mate, he was still under the shipping contract, being only advanced to a higher grade, and entitled to a greater compensation. By the first article of that contract, it is stipulated that the shares of the seaman are "to be paid pursuant to this agreement, and the custom and usage in the port of Nantucket."

By the ninth article it is provided "that each and every officer and seaman * * * shall be entitled to the payment of his share of the net proceeds of the voyage * * * as soon after the return" of the vessel to her home port, as the oil and other products of the voyage can be sold, and the settlement adjusted by the owner. This is the only express provision in the contract as to the time of payment, and it contemplates a payment only after a return of the vessel to Nantucket, an event which became impossible by perils of the sea. We should then, under the terms of the first article, inquire whether there be any usage embracing the present case. No evidence of usage was introduced. The crew list was, indeed, offered for that purpose, but it proves nothing. I have some reason to believe that in the whale fishery there is an established usage for the master to pay a seaman his lay or share, by a delivery of oil or otherwise, in a foreign port, when the voyage is there broken up, or the seaman is otherwise rightfully discharged. But I cannot judicially assume it to exist. I must, therefore, consider this voyage as having been broken up by a calamity not contemplated by the shipping articles, nor covered by any usage. The rights of the parties upon such a contingency, must be deduced from the terms of their contract, the nature of the business, and the principles and analogies of the maritime law. By the terms of their contract, the parties engaged in a joint adventure, in which the ship-owners furnished the vessel, equipments and provisions, and the crew furnished the labor and skill for this fishery, and the products are to be divided in certain specified proportions. The crew are to have no wages or compensation, except the stipulated share of the proceeds. It was at one time contended that this contract constituted a partnership between the owners and crew, or at least, that each seaman was a joint owner of the proceeds; but upon considering the nature of the business, and the best mode of securing its objects, and the interest of all parties, it has been judicially settled that the legal ownership in the oil and other proceeds, vests in the owners of the vessel, who are bound to take care of and dispose of them for the benefit of all concerned. See Knight v. Parsons [Case No. 7,886]. But although the seamen have no legal ownership in the oil, yet it is the fund, and the only fund, from which

they are to be paid for their services, and they have a lien upon it which will continue, until it shall have been sold by the owners, under the authority given by the articles. The contract contemplates that, upon a termination of the enterprise, the proceeds shall be divided. It makes provision for only one termination, viz: a return of the vessel and crew to Nantucket; this has become impossible. The voyage has been brought to an end, in a foreign port, by an overwhelming force. The master then became, from necessity, the agent of the owners, and was bound to do whatever he might to diminish the common calamity and promote the interests of all the parties. The master could not furnish another ship and outfits for the prosecution of the fishery, and he did not offer to the crew any means of returning home.

Was the master bound to leave them destitute in a foreign country, when the oil which they had taken, the fund from which they were to be paid for their services, was in his hands, and they were desirous of receiving their share in full compensation? This could not be detrimental to the owners; their full proportion would remain in the hands of their agent, the master, to be sent home to them. It relieved the owners from any further care or responsibility of that part of the proceeds which was to go to the crew. No fact has been stated from which it can be inferred that the owners have been in any degree injured by this payment to the libellant, or that they would have been in any degree benefited, if the master, instead of delivering a portion of the oil to the crew, had kept it all together, for the purpose of sending it home.

It has been suggested, that by delivering to the crew their proportion of the oil, their care and oversight of the rest were withdrawn. But they were withdrawn by the destruction of the ship. The oil was then in the sole possession and control of the master; the crew had no voice in its management or disposition, and had no means of accompanying it, if it were sent home. The enterprise having been terminated in a foreign port, by a common misfortune, and it being in the power of the master to diminish the loss and suffering of the crew, by paying them out of a fund specially appropriated for that purpose, without detriment or inconvenience to the owners or any other party, he was authorized to do so. Indeed it would have been unreasonable and unjust, on his part, to refuse.

It has been urged that the oil was the cargo of this vessel, and that the master had no authority to sell or divide it, but only to send it home. But the proceeds of a whaling voyage are much more analogous to freight, than to the cargo of a merchant ship. They are the earnings of the voyage, and a fund to which the crew have a right to look for payment, and it would not be

doubted that the master of a merchant ship, when a seaman is discharged abroad, either voluntarily or from necessity, having freight money in his hands, would be authorized to pay the wages previously earned.

The legislation of congress tends to the same result. By Act 1840, c. 6, § 2 [5 Stat. 370], whaling ships are brought under the first section of Act 1803, c. 9 [2 Stat. 203]. The proviso to that section expressly recognizes the authority of a consul to consent to a discharge of a seaman abroad. Under what circumstances, and upon what terms and conditions, he may so consent in the case of merchant seamen, will be found in the subsequent provisions of that act and of several later statutes. One of the cases in which the consul may discharge is the joint application of the master and mariner. The right of a master to agree to the discharge of a seaman being thus recognized, it would seem to follow that he would be authorized, as one of the reasonable terms of that agreement, to pay him his wages. But the statutes go further, and generally require the payment of three months wages over and above the amount then due. Surely these acts, which provide for the payment of extra wages abroad, contemplate that the master may pay the wages actually due. By Act 1856, c. 127, § 26 [11 Stat. 62], it is provided that in cases of ships or vessels "condemned as unfit for service, no payment of extra wages shall be required."

In the present case it appears that the proceedings at Apia were with the concurrence of the master, the libellant and the consul, and that all united in making this payment to the libellant. The authority of the master to make such payment is sustained by the principles and analogies of the maritime law, and the acts of congress, relating to merchant seamen.

I am of opinion that the payment to the libellant was rightful, and that he is entitled to recover his share or lay of the proceeds sent home from Honolulu, without any deduction on account of the oil received by him at Apia. Decree for libellant with costs.