### ARTHUR D. STORY *vs.* CHARLES A. RUSSELL.

Essex.   December 9, 1891. — September 17, 1892.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Fishing Voyage — Statute — Lien of Master and Seamen — Subrogation.*

If the catch of a fishing voyage is delivered to the owner of the vessel to be sold, the master and seamen have, under the U. S. Rev. Sts. §§ 4391–4394, no lien which can be enforced against the money received from the sale of the fish; and hence, where the vessel has been sold to pay the demands of the master and seamen, there is nothing to which the mortgagee of the vessel can be subrogated. HOLMES, KNOWLTON, & MORTON, JJ., dissenting.

BILL IN EQUITY, filed March 16, 1891, against the defendant, as assignee of the estate of George E. Thurston of Gloucester, an insolvent debtor.

The bill alleged that Thurston duly mortgaged a fishing vessel to the plaintiff on May 4, 1889, for $5,820; that in September, 1890, Thurston, being in possession of the vessel, sent her on a fishing voyage, from which she returned about December 16, 1890, with a fare of fish, which was sold by Thurston to David B. Smith and Company; that, soon after, the proceeds were attached in the hands of Smith and Company by creditors of Thurston; that about December 20, 1890, the master and seamen proceeded against the vessel in admiralty for their respective shares of the proceeds of the fish, recovered a decree for the full amount of the same, and the vessel was condemned and sold according to law; that, after the payment of all demands and costs, the sum of $3,222.77 remained, which was paid over to the plaintiff, leaving a balance due him on the mortgage; that about December 23, 1890, proceedings in insolvency were instituted by Thurston, and about January 13, 1891, the defendant was appointed assignee and received from the messenger the sum of $738.07, which the messenger had received from David B. Smith and Company; that by the terms of the agreement the master and seamen were to receive for their services a share of the proceeds of the voyage; that the master and seamen had a lien on the proceeds of the fare of fish and the vessel for their shares; and that the mortgage of the plaintiff was on the vessel only.

The prayer was that the plaintiff be subrogated to the rights of the master and seamen in the proceeds of the fare of fish, that the defendant be ordered to pay over to him the sum of money received by him from the messenger, and be restrained from otherwise disposing thereof.

The defendant demurred to the bill for want of equity. The Superior Court overruled the demurrer, judgment was entered for the plaintiff, and the defendant appealed to this court.

The case was submitted on briefs to all the judges.

*C. A. Russell,* for the defendant.

*J. J. Flaherty,* for the plaintiff.

LATHROP, J. The principal question in this case is concerning the construction to be given to the U. S. Rev. Sts.

§§ 4391–4394. These sections apply to the bank and other cod fisheries, and to the mackerel fishery. So far as the cod fisheries are concerned, their provisions have been in force since 1813. U. S. St. of June 19, 1813, c. 2 ; 3 U. S. Sts. at Large, 2. And they were extended to the mackerel fisheries by the U. S. St. of March 3, 1865, c. 117 ; 13 U. S. Sts. at Large, 535.

Section 4391 provides that the master shall make an agreement in writing with every fisherman who may be employed in such a voyage, except only an apprentice or servant of the master or owner, " and, in addition to such terms of shipment as may be agreed on, shall, in such agreement, express whether the same is to continue for one voyage or for the fishing season, and shall also express that the fish or the proceeds of such fishing voyage or voyages which may appertain to the fishermen shall be divided among them in proportion to the quantities or number of such fish which they may respectively have caught. Such agreement shall be indorsed or countersigned by the owner of such fishing vessel or his agent."

The first part of § 4393 is as follows : " Whenever an agreement or contract is so made and signed for a fishing voyage or for the fishing season, and any fish caught on board such vessel during the same are delivered to the owner or to his agent, for cure, and sold by such owner or agent, such vessel shall, for the term of six months after such sale, be liable for the master's and every other fisherman's share of such fish, and may be proceeded against in the same form and to the same effect as any other vessel is by law liable, and may be proceeded against for the wages of seamen or mariners in the merchant service."

It is contended by the plaintiff that the seamen on a fishing voyage have a lien on the catch, and that, if the catch is delivered to the owner of the vessel to be sold, the lien still remains, and can be enforced against the money received from the sale of the fish. Reliance is placed upon certain remarks of Judge Sprague and Judge Lowell, in cases before them in admiralty, relating to whaling voyages. In *Hussey* v. *Fields*, 1 Sprague, 394, which was a libel *in personam* brought by an officer of a whaling ship against the owners to recover his share of the proceeds of the sale of certain oil which had come to their hands, the oil having been shipped home from Honolulu, no question

was made as to the liability. The only question was as to a right of set-off. After this oil was sent home, the vessel took more oil, put into Apia, and was there condemned as unseaworthy. The officers and crew were settled with by the master, so far as this oil was concerned, by delivering to each his share of the oil then at Apia, in the proportion which, by the shipping articles, each was to have of the net proceeds of the actual products of the voyage upon the arrival of the ship at her home port. The libellant took his share, and afterwards sold it. The respondents contended that the libellant had wrongfully converted the oil at Apia, and that the value of this oil could be deducted from his claim on the oil sent home. The point decided in the case is well stated in the head note, as follows: " Where a whaling voyage is from necessity broken up in a foreign port, the master, on request of the seamen, is authorized to pay them their respective shares of the proceeds, by delivering to them, at such foreign port, portions of the oil taken, although, by the shipping articles, the distribution of proceeds was to be made after the return of the vessel to the home port."

In delivering the opinion, Judge Sprague said : " By the ninth article [of the shipping contract] it is provided ' that each and every officer and seaman . . . shall be entitled to the payment of his share of the net proceeds of the voyage . . . as soon after the return ' of the vessel to her home port, as the oil and other products of the voyage can be sold, and the settlement adjusted by the owner. This is the only express provision in the contract as to the time of payment, and it contemplates a payment only after a return of the vessel to Nantucket, an event which became impossible by perils of the sea." After stating that he had reason to believe that in the whale fishery there was an established usage for the master to pay a seaman his lay or share, by delivery of oil or otherwise, in a foreign port when the voyage is there broken up, or the seaman is otherwise rightfully discharged, but that he could not judicially assume the usage to exist, he went on to say : " I must, therefore, consider this voyage as having been broken up by a calamity not contemplated by the shipping articles, nor covered by any usage. The rights of the parties upon such a contingency must be deduced from the terms of their contract, the

nature of the business, and the principles and analogies of the maritime law. . . . It was at one time contended that this contract constituted a partnership between the owners and crew, or at least that each seaman was a joint owner of the proceeds; but upon considering the nature of the business, and the best mode of securing its objects, and the interest of all parties, it has been judicially settled that the legal ownership in the oil and other proceeds vests in the owners of the vessel, who are bound to take care of and dispose of them for the benefit of all concerned. But although the seamen have no legal ownership in the oil, yet it is the fund, and the only fund, from which they are to be paid for their services, and they have a lien upon it which will continue, until it shall have been sold by the owners, under the authority given by the articles. The contract contemplates that, upon a termination of the enterprise, the proceeds shall be divided. It makes provision for only one termination, viz. a return of the vessel and crew to Nantucket; this has become impossible. The voyage has been brought to an end, in a foreign port, by an overwhelming force. The master then became, from necessity, the agent of the owners, and was bound to do whatever he might to diminish the common calamity and promote the interests of all the parties." In answer to the argument of counsel that the oil was the cargo of the vessel, and that the master had no authority to sell or divide it, but only to send it home, the learned judge said: "But the proceeds of a whaling voyage are much more analogous to freight, than to the cargo of a merchant ship. They are the earnings of the voyage, and a fund to which the crew have a right to look for payment, and it would not be doubted that the master of a merchant ship, when a seaman is discharged abroad, either voluntarily or from necessity, having freight money in his hands, would be authorized to pay the wages previously earned."

In *Two Hundred and Ninety Barrels of Oil*, 1 Sprague, 475, it appears that a libel *in rem* was brought by seamen against oil, the product of a whaling voyage. The only questions discussed in the opinion relate to costs, and the circumstances of the case do not appear. An examination of the record of the case shows that the libellants had been discharged in a foreign

port, the oil shipped home, and the vessel had gone on another voyage; and no objection was made as to the power of the court to entertain a libel *in rem.*

In *The Antelope*, 1 Lowell, 130, a whaling vessel had been wrecked, certain oil had been sent home, and the crew brought a libel against the oil to recover for services as salvors and for their lays. Judge Lowell expressed the opinion, that until a sale was made the seamen had a lien on the oil for their wages; and that it might be worked out by analogy to the lien of a seaman in the merchant service on the freight; and it was said that, " where the owners of the vessel own the cargo, they would be liable for a reasonable freight in all controversies and adjustments in which that question became important; and no doubt the right might be enforced in any proper case against the cargo itself."

We do not understand Judge Lowell to intend to assert that a seaman has a lien for his wages against the cargo of a vessel, even if that cargo belongs to the owners of the vessel, except so far as to compel the owners to bring an amount equal to a reasonable freight into court. Whether this can be effected by a proceeding *in rem* against the cargo is a question about which there is some conflict of authority. See *Sheppard* v. *Taylor*, 5 Pet. 675, 712; *Poland* v. *Brig Spartan*, 1 Ware, 134; *Skolfield* v. *Potter*, 2 Ware, 394, 402.

In each of the above cases decided by Judge Sprague and Judge Lowell, the contract entered into by the crew could not be performed according to its terms. But where the contract is not put an end to, it is difficult to see how there can be a lien, inasmuch as the seamen have agreed that owners have the right to sell the oil and bone, and that they will receive their pay out of the proceeds. " This agreement," as said by Judge Lowell in *The Antelope*, 1 Lowell, 130, 132, " must undoubtedly confer upon them [i. e. the owners] the right to give a good title, clear of all liens; and they might probably sell the oil and bone before its arrival home." If a lien exists, it cannot be enforced in violation of the express terms of the contract; and the remedy of the seamen is either by an action *in personam* in the admiralty, as in *Hussey* v. *Fields*, 1 Sprague, 394, or by an action at common law, as in *Bishop* v. *Shepherd*, 23 Pick. 492.

No case has been called to our attention, and we know of none, where, after the vessel has arrived home, a libel *in rem* has been maintained against the oil, or in which, when the oil has been sold, such a libel has been brought against the proceeds. Indeed, it is difficult to see how a libel could be brought against money. But whatever the law may be as to a lien in the case of contracts relating to whaling voyages, we are of opinion that the remedy given by § 4393 of the U. S. Rev. Sts. is exclusive. In the first place, it is to be noticed that this section gives a very different remedy against the vessel from that which a seaman has by the general maritime law. By the statute, the right to proceed against the vessel is limited to six months after the sale of the fish. By the maritime law such a right is lost by laches, and the question of the time in which a libel may be filed is determined by all the circumstances of the case. See 2 Parsons, Ship. 361–363. Again, by the statute the master of the vessel may proceed against the vessel for his share, while by the maritime law he cannot libel the vessel for his wages.

If the statute gave the same right of action which exists in the case of a seaman in the merchant service, it might well be argued that the statute was merely declaratory, and did not cut off other remedies which exist by the maritime law. But this, as we have seen, is not the case. It would also have been very easy, if Congress had intended that the seamen should have the right to proceed against the fish for their wages, to have inserted a clause to this effect. Under the statute, a fisherman has the right to take his share of the fish; and this was probably at one time the custom. In Abbott on Shipping, (7th Am. ed.) 868, and in Curtis on Merchant Seamen, 389, is found the form of the shipping papers formerly used in the New England States. This recites " that, in consideration of the said master or skipper, and the fishermen being entitled to five eighth parts of the fish which may be caught on board said schooner during their service on board the same, and also to five eighth parts of the money which by law is allowed to said schooner during the same term, after deducting the general supplies and other supplies, according to the usage and custom of . . ., they severally shall and will perform their duty," etc.

If, however, the master and fishermen choose to deliver the fish to the owner or his agent to be cured, as well as to be sold, it would be absurd to suppose that they could at any time libel the fish for their share. Such a proceeding might work irreparable injury. The fish are brought to port in a fresh or partly salted condition, and must be either sold at once or cured ; otherwise they perish. They differ entirely in this respect from oil and bone, the product of a whaling voyage.

The case of *Re Low*, 2 Lowell, 264, while it applies, without any discussion of the question, the principle applicable to whaling voyages to fishing voyages, does not carry the doctrine further than the cases above referred to, decided by Judge Sprague. The facts were these. Before the vessel's return from a fishing voyage her owners failed, and went into bankruptcy. On the arrival of the vessel at her home port, the marshal took possession of the vessel and her catch, and turned them over to the assignees in bankruptcy, who sold part of the catch. The seamen libelled the vessel in admiralty for their wages, and obtained a decree. The mortgagees of the vessel were allowed to be subrogated, as against the assignees in bankruptcy, to the lien of the crew against the proceeds of the fish. The case was decided on the authority of *The Antelope*, *ubi supra.* It will be noticed that in the case of *Re Low*, the contract could not be carried out.

It is further suggested that the language of § 4394 recognizes a lien on the fish and the proceeds. This section, after providing for the release of the vessel by the owner's giving a bond, proceeds as follows : " Nothing in this or the preceding section shall prevent any fisherman from having his action at common law for his share or shares of fish, or the proceeds thereof." This simply reserves an action at common law, and cannot be construed as recognizing a lien, which, after possession is given up, cannot be enforced at common law. There is nothing peculiar in the clause. It is similar to the language in § 4557, in which, after an action *in rem* is given to seamen in merchant vessels for wages, it is provided : " But nothing herein contained shall prevent any seaman from maintaining any action at common law for the recovery of his wages." So in § 563, cl. 8, giving the District Courts jurisdiction in admiralty, there is the

clause, " saving to suitors in all cases the right of a common law remedy, where the common law is competent to give it."

The existence of these clauses is doubtless due to the jealousy which formerly existed against tribunals which proceeded, according to the course of the civil law, without a jury.

As, in the opinion of a majority of the court, the seamen in the case at bar had no lien on the fish or their proceeds, inasmuch as the contract was performed, and the fish delivered, it follows that there was nothing to which the plaintiff could be subrogated. The judgment for the plaintiff must therefore be reversed; and the demurrer sustained.

*So ordered.*

HOLMES, KNOWLTON, and MORTON, JJ. dissent from this decision.